On calendar for argument is DelVecchia v. Frontier Airlines, Inc. Counsel for appellant, please approach and proceed. Thank you, Your Honors. Good morning. I'm John McKay and I represent the appellants, the DelVecchias. I'll reserve five minutes for rebuttal. Counsel, please be reminded that the time showing is your total time remaining. Yes, Your Honor. Thank you. Sorry. No worries. What happened to the DelVecchias on the Frontier Airlines flight was the same thing that the late Justice Scalia determined was illegal, immoral, unconstitutional, inherently wrong, and destructive to democratic society. A Frontier crew on an airplane separated a black child from his white father based on their looks and fabricated criminal allegations against them, allegations which the FBI later determined were baseless. What happened to their civil case in the district court was no less wrong. The district court made several critical errors for which we seek reversal. It applied the immunity of 49 U.S.C. 44941 beyond its well established purpose in a way that no other court ever has to conduct unrelated to airline security. It violated its duties under Rule 56 on a motion for summary judgment by disregarding relevant evidence, by applying evidence in favor of the movement that the jury was not required to believe, by failing to make reasonable inferences in the DelVecchias' favor, by weighing the evidence, by making credibility determinations that it was not permitted to make. It applied the four-factor test of Lindsay versus SLT Los Angeles as if it were statutory, rather than applying the Supreme Court precedent from McDonnell Douglas and its progeny that the factors of McDonnell Douglas are to be applied flexibly to the facts of individual cases. Did airline personnel know of a relationship between the two? Well, they claimed they didn't, Judge Hawkins, but the truth is that the airline from the beginning knew that they both had the same surname because there was this passenger name record, or PNR, that identified every transaction that Peter DelVecchia made and also named his son with the same surname. And in fact, there was testimony from one of the flight attendants that the captain used the terms the father and the son, even though the captain claimed in his deposition that he didn't know their relationship. The six crew members were unable to come up with one set of facts about what happened that correlated to everyone else's statement of facts. There were six different stories by the crew members about what happened on the flight. Was there not some agreement that there was, the father was caressing the child's face? That agreement is overstated, Judge Brass, because in fact, Peter said, well, you know, I do sometimes touch my son's face, and the son said in deposition after a haranguing bunch of questions from defense counsel that, okay, you know, my dad might have rubbed my face. The word rubbed was used quite a bit in the questioning. But when it was demonstrated by the one flight attendant who claimed to have seen it, it was a nothing burger, if you'll excuse the expression. It was simply this. And I really would recommend that the court grant our motion to allow the videotape evidence to be put in the record, because you can see at the area that I marked on the video where I asked her, you know, exactly what happened? What did you see? And she said it was like this. And she said it was nothing that a parent would ever do to their child. And I thought, well, you know, I went on the internet, and I found, you know, dozens of examples of this. I mean, it's just a... But what does this prove? I mean, I think that the flight attendants, you know, the testimony from the flight attendant was it wasn't normal. She hadn't seen a parent doing that before. And so these are people who are trained in safety. And, you know, we're all trained that if you see something, say something. And so they saw something that looked out of the ordinary. And, you know, it was later investigated and determined not to, you know, have a basis, apparently. But at the time, they're seeing this, and they were concerned. And so I guess the question is, you know, where did they go wrong in all of this? And where does it state a claim? You know, I mean, it's unfortunate to have had this happen. But where's the legal claim here? I'm happy to respond to that, Judge Bress. First of all, it wasn't they that saw it. It was one flight attendant. And she was trained not just if you see something, say something. But if you see something, get another crew member to see it also before you report it to the captain. That was a standard operating procedure. And it was not followed. And the chief pilot at the time, who was the corporate designee in the deposition of Frontier Airlines, determined that was inexplicable. That was exactly the word he used. Inexplicable. Why she didn't get another person to see it. But then she lied. In her testimony, she said, and in her statement to the captain, she said, Amanda Nicol, another flight attendant, also saw it. And in fact, I know it was done for too long because that's based on what Amanda saw. Amanda Nicol testified she never saw it. And in fact, she told the captain she never saw it. So the captain knew. What does this prove from a legal perspective, right? How does this amount to a legal claim? And certainly, Your Honor, to start with the caressing, so to speak, or the rubbing, whatever you want to call it, is wrong. Because their own testimony stated that they started surveilling these people before that ever happened, long before that ever happened, based solely on their looks. They didn't say on their looks, but they said the appearance they had made them feel uneasy. They looked awkward together. And they decided that they should be watched. So defense... Was race mentioned at all? I'm sorry, Your Honor? Was their race mentioned at all when they were talking about that they looked awkward together? No. And that's a fair point. But the depositions of three of the four flight attendants and both of the pilots, no, and one of the pilots occurred after a meeting with counsel in which they all participated. And they testified that they had just sat down with defense counsel. So I'm not surprised that they didn't mention race when they'd all been sued for race. No, but I mean, was race mentioned at the time when they were saying that they looked awkward together? Another interesting point, Your Honor, the testimony was that from Pilot Mullins, the first officer, co-pilot, he said that in fact descriptions of them had been given by the flight attendants, yet everybody else denied that they had ever mentioned their race. And Captain Shoup said he never knew their race until the flight landed. Captain Shoup was standing in the galley talking about them with all the flight attendants that was only 17 rows away from where they were sitting. Their races were demonstrably obvious. Exactly. Exactly. And there's no other explanation for why their appearance made the flight attendants feel awkward. The only thing they ever did, they walked onto the plane, they sat down, they were asked about the young boy's age. They said 12. They said they would be happy to exchange seats with another couple. And they did. That's it. After the flight took off, they fell asleep. There was nothing to warrant determining that they were unusual or that they should be surveilled other than their appearance. I don't know that anyone was surveilling them, as you say. I mean, it seemed that in the testimony they identified some things that were a little different, but then they saw the caressing or the stroking of the face. And that's really what set in motion the whole events. It wasn't him, you know, not answering what drink he wanted or something like that. That's not what led to this. I think that's buying Hook, Line, and Sinker, the defense strategy, that it all began with the face caressing, because that's not what the timeline shows in the testimony. And this testimony came from them themselves, from the flight attendants themselves. The first flight attendant who was deposed was Ms. Bright, who unfortunately has a different last name that's shown on the transcript, Sakuruda. That's a married name. But in the majority of the documents in the case, she's called Bright, Chelsea Bright. A nice young lady. That's the one that did the demonstration. She said that she was thinking about the flyer that they got two months beforehand that said that they should be alert to human trafficking. And she mentioned human trafficking in a statement that Sergeant Obasi heard in the jet bridge when the flight landed. She said, one's white, one's black, I don't believe they're related. This makes me think, or something to the effect, this makes me think of my training about human trafficking. She testified that human trafficking to her means a child who is with somebody they shouldn't be with that's not their parents. And she then declares on the jet bridge, I don't think they're related. What possible reason could she have for thinking they're not related other than they're disparate races? I see my, I've gone beyond my 10 minutes. I'd like to reserve some time for rebuttal. All right. Thank you, counsel. Thank you. Good morning, Your Honors. Good morning. Good morning, counsel. May it please the court. My name is Richard Harris. I'm here today on behalf of Frontier Airlines. Your Honors, this flight crew acted admirably.  I believe they acted, yes, quite admirably, given the circumstances. Would you dispute that the father was hit in the head? Do you dispute that? Absolutely. Yes, and there's no evidence. Question of fact about that? There's no evidence to support the allegation that we've had years of discovery, broad avenues of discovery. Is there medical evidence of him having a concussion? He submitted some doctor reports that said that weeks after the incident, he had an incident where he fell and hit a ping pong table on his head. And the doctor deduced, apparently, that this was not a brand new concussion, but had exacerbated a previous concussion. Do you think the doctor made that up? You know, it's not my place to say that the doctor made that up, Judge. I would say I question it, yes. I do not believe that Peter Delvecchia was punched in the back of the head during that flight. At a minimum, isn't that a question of fact? I don't think so, Judge. Respectfully, there's not a shred of evidence to support it. There's, everyone sitting around there was interviewed. And, Krista? If I say someone hit me in the head and they deny it, that's not a question of fact? Well, there has to be some evidence, though, under cell attacks to support it. My statement wouldn't be enough evidence. If I testified under oath in a deposition that someone hit me in my head, and the person testified under oath that they didn't hit me in the head, would that be a question of fact? If that's all we had, it might be, Your Honor. But, respectfully, I think they can't just proceed on their own self-serving allegations. Christopher Higgins was seated three rows behind him. He's a 25-year New York police officer. He testified he remained vigilant the whole time, had his eyes on it, and said that it was reaching over and tapping. He said that the whole incident went kind of easy. No one seated around them reported seeing this. And, what's more, they were asleep. And, as the court pointed out, as he's asleep, and they both say they were asleep, and this is, you know, they took their sleep aids, okay? Importantly, they both took their sleep aids, and they say they don't remember anything until they're awakened and asked to get out of the aisle, okay? And, at that point, you know, we have two individuals who contracted for airfare to Las Vegas to seat together. Now, airlines reserve the right to change seats, change bags, however needed, as is necessary. There was a change of seats, right? Right. So they were reseated. Which the father and the son agreed to, correct? Correct, because the son was too young. And so they're reseated without incident. Now, subsequently, Chelsea Bright sees the stroking of the face that makes her uncomfortable. And I have no problem with you watching the video of that. She said he was stroking her up and down, up and down, looking at him intently. Said she'd never seen anything like that before. It made her uncomfortable. So she reported that to the captain, okay? Subsequently, and it's undisputed, the plaintiffs are both sound asleep. They've alleged it over and over in the complaint, and it's in the depositions in the written discovery. I have two sons, and I have routinely kissed them on the cheek from the moment they were a baby until now. One is 55. The other is 40. I can't do that on an airplane? I'm not saying that at all, Judge. And I kiss my child as well and hope to do so forever. I hope everyone here does. This isn't about the kissing on the cheek. It's about the fact that the flight attendant, Warren, observed Peter's hand on A.D.'s crotch. And they're both asleep. So this report is made to the captain. And the captain says, okay, we're going to preserve the status quo. To the extent that there may be some ongoing incident of child endangerment, we're not trained law enforcement officers. We're going to take A.D. to the back of the flight, and we're going to let the trained law enforcement officers sort this out. Counsel, was there a passenger who was seated near them who said he never saw that? He never saw the father put his hand on the crotch? I believe. I don't think that any of the other passengers confirmed seeing the hand on the crotch. That's not the question, Counsel. Isn't it true that there is a passenger who said who observed them and said he never saw that happen? I believe the passenger who was seated in that row said he never saw it happen. Okay. I believe he also said he wasn't specifically looking out for that. I think, though, the fact that the question of fact, Counsel, if he said he never saw that happen, he was seated in the same row, isn't that at a minimum a question of fact? And I understand the question, Judge. I respectfully disagree, because he's asleep and because he lacks the foundation to challenge that the Delvecchia's are both asleep. And so they lack the present sense impression to be able to challenge that. And importantly, Peter Delvecchia even he testified that he himself was concerned after the fact. Counsel, may I ask you this about the hit in the head? Didn't the PNR say something about passengers reported seeing someone being hit in the neck or in the neck area? And I'm glad you bring that up, Judge, because that is a report from Peter Delvecchia himself calling into Frontier Customer Service and saying he's registering his complaint, he's following up, and he's saying he spoke with the FBI. And he's saying the FBI told him that they interviewed people and that someone saw this happen. So this is Peter Delvecchia injecting multiple layers of hearsay into the PNR. So that evidence, I don't believe, should be considered at all. And I understand that we have a classic he said, she said, which would ordinarily set up a traditional question of fact. But here, when we have, they all say that they were asleep. And then, you know, this has happened before in movie theaters. That's what he tells, or in a different flight. And that's what A.D., the child, tells F.A. Warren immediately when he takes them to the back row. He says, this has happened before. So, you know, they fall asleep. They're affectionate. There's nothing wrong with that. They're holding hands. There's nothing wrong with this. And the hand falls on the lap. I'm not saying that something nefarious was afoot. But they're, they've both admitted that they took sleep aids and they fell asleep. And they have no recollection of what happened after that. Is it your position, counsel, that ATSA immunity extends to the entire course of action by the airline and its employees? I would not say to the entire course. I think. Okay. Then tell me to what extent that immunity does not extend. Well, I would start by saying that the immunity applies. And I think that's an important. I understand that's your argument, that it does apply. I want to know, does it extend to the entire course of conduct? I think you've now told me no. Is that right? I think it extends to the actions that logically flow from a protected disclosure. And I think the district court was very careful. My question was the entire course of action. No, I'm not saying that it's blanket immunity. There could be circumstances where that's the case. I think it's a case-by-case basis. It's a factual. What claims are you claiming are covered by the immunity? The defamation, okay, the statements from the ACARS to law enforcement, the defamation and the false imprisonment. So why would the false imprisonment be covered? I think the district court correctly analyzed that. Because if we've, we're making a report, okay, we've got a legitimate concern about an ongoing issue of child endangerment, that we would make that report and then not be able to act on it, that's potentially we're allowing this conduct to carry on. And so separating the two was, I think, a very reasonable decision in exercise of the captain's discretion. But why is it covered under the immunity? Because it's conduct, I think, that the district court Is it a disclosure? It's not a disclosure, but I think it's the district court reasoned it reasonably flows from the disclosure, that it logically flows. Is there a case that you rely upon to support the argument that if something reasonably flows from the disclosure, it's covered by the immunity? What case says that? Well, the Abdullah case and the Bias case from the second district Second district? Circuit have both acknowledged that it can apply to more than the disclosures. Now, Abdullah says that it's only to the extent that you're acting on the instructions of the law enforcement officers. Well, right. I mean, the Abdullah case talks about impacts that flowed from decisions made by law enforcement officers. So we don't have a claim against any law enforcement officers here. I think that in the district court, I think, correctly analyzed, well, we don't always have time to get the law enforcement's instruction. You know, they're not always available. But what did happen here is that, you know, unlike in Abdullah, the captain is actually working against the law enforcement and the security officers who advised him there is no security threat. That plane should leave. That captain's working against law enforcement. Here, our captain is working with law enforcement through the ACARS. They're OK. We'll have Leo's. Nobody told the captain to separate the two. I mean, he made that decision. We can debate whether that's reasonable, what other defenses you would have. But it's not a disclosure, right? So the immunity statute doesn't seem to be as broad as would cover that. I think, you know, the district court looked at the language. It said all of the laws and regulations of the United States, not simply defamation and reputation-based torts. Now, I understand reasonable minds can disagree. And perhaps you want to restrict the extent of the ETSA immunity. Well, you did give us a case in the Ninth Circuit that would require us to do that. So that's why I asked you, what's the case authority for saying that the immunity extends this broadly? Well, and I'm not going to tell you that exists, Judge. There's not a lot of case law out here on the ETSA immunity. So, but, you know, the false imprisonment claim, I think, fails on its own merits. Because the child was never, he was never confined to a space. He was simply separated. He was confined to a seat. Was he allowed to leave and go sit with his father again? That's the only place he was not permitted to go. But anyone, you know, whenever you fly, it's not as. He has a law enforcement agent sitting beside him. It's pretty big. You didn't think that that would cabin him, that he would feel like he couldn't move from that seat? I'm not certain he knew that it was a law enforcement officer. And I'm not. I mean, he could have gone to the bathroom. He could have gotten up to stretch his legs if needed. The only place he was restricted from going was to be near Peter, who is the perceived threat. So I don't think that that is, you know, is false imprisonment. I don't think it meets the element. When I fly home here later today, it's not as though I have a right to just free reign, go wherever I want on the aircraft. I still have certain limitations. And the AD's limitations were not restricted in any other fashion except in Peter Dalvecchia was allowed to come up and talk to him from the aisle. OK, so yes, given these circumstances, and I do think it's undisputed, if the court district court correctly ruled, that F.A. Warren observed Peter's hand on AD's crotch. And so now we have two reports that give rise to this justifiable, reasonable decision that the captain makes in the moment. Counsel, what about the IIED claim? Do you think the amenity goes to that? I'm not saying that. I'm not making that argument today, Judge. I think, though, on the IIED claim, it is important that the last things Peter Dalvecchia says is once he learned the police were coming, he said, thank God, because in my mind, five minutes and this will be on our way. That's not consistent with someone who was just pummeled and concussed. It's consistent with someone who doesn't want to escalate the situation. It's very difficult in a charge, in a racially charged atmosphere. One of the primary things is to get out of the situation without it escalating. And so for him to say that doesn't necessarily mean he agrees with what is taking place. He wants to get out of the situation and deal with it later. Isn't that a reasonable interpretation of his actions as well? Yes, it is. And I think the broader point I was going toward was on the IIED. It's showing they did not suffer any extreme or emotional distress in that moment. Now, to their true grievances with the FBI, in their minds, if this had gone like the other two occasions, five minutes and they're on their way, we're not here today. The only reason we're here today is because when they told the law enforcement and F.A. If that hadn't happened, we wouldn't be here today. They could have brought an FTCA claim against the FBI. They did not. I appreciate your time today, Your Honors. Unless you have any further questions, my time is up. Thank you, counsel. I'd ask to affirm the district court's ruling. Thank you. Thank you, Counsel Rapato. I'd like to just rebut, excuse me, a couple of quick points. If this was admirable conduct, it clearly violated what the DOT said that crew members should not do, which is to discriminate in the performance of their duties. Frontier got that recommendation from the DOT and its representative testified that, well, we decided we didn't need to do anything about that. Training of the type that the DOT recommended costs money. The concern about child safety that Judge Bress alluded to, this would be like saying that in the Christian v. Walmart case, the concern was about shoplifting. False allegations of criminal behavior are well-known racist tropes. And we cited a number of cases in a footnote in our brief about that. The hit on the head and the hand on the crotch are clearly questions of fact. With respect to Mr. Higgins, the off-duty officer, the jury was not required to believe him. In fact, his testimony is replete with errors and racist tropes. The Reeves case by the Supreme Court, Reeves v. Sanderson Plumbing Products, says that the court must disregard on a motion for summary judgment evidence favorable to the moving party that the jury is not required to believe. And that clearly fits the Higgins testimony. Also, did the child note that the officer was a law enforcement officer? Is there anything in the record regarding that? I don't think so, Your Honor. The PNR, we have to be very careful because Frontier meshed together its investigative notes with what is the PNR. The PNR is in a software called Navitaire. It's available to everybody who works for Frontier, even if they're not an employee of Frontier, if they're an independent contractor. RNT, Right Now Technology, is the note system that they use to record their own investigations. That's not available to the wider employee base. That's where the note was that talked to the FBI, eight people interviewed, some guy was hit on the back or the neck. If Peter made that statement, he wouldn't have called himself some guy. This was clearly a note by somebody internal to Frontier, noting that they had talked to the FBI. It was not from Peter, and it was not in the PNR, the passenger name record. Peter was not allowed to come and talk to his son. In fact, he was forcibly blocked by Flight Attendant Warren, who Peter testified said, you know what you did, and told him to go sit down. There, on respect to the ATSA immunity, the ACARS message was sent after most of this had occurred, after the separation, after the hit on the head, after the surveillance, after the awkwardness. All of those events occurred prior to the ACARS message being sent. If the court were to adopt and affirm the district court's finding with respect to the ATSA immunity statute, it would be affirming the precise error that the Gustafson court reversed. Thank you. Thank you, counsel. Thank you to both counsel for your helpful arguments. The case just argued is submitted for decision by the court. The next case on calendar for argument is Acacia, I mean, the next case on calendar, Acacia Tapia v. Bondi has been submitted on the briefs.
judges: HAWKINS, RAWLINSON, BRESS